Good morning. Good morning, Your Honors. Andrew Chang for Plaintiff and Appellant. May it please the Court, this has been a long, arduous journey, and not just because this is one employee against a huge bank, one of the biggest banks in the world, it's because this is an all-too-familiar dispute having to do with a personnel decision where the employee claims she was displaced in retaliation for taking a medical leave of absence. I think we know the facts, okay, I think we've kind of taken the deep dive on all of that, so since we have limited time, I'm going to tell you what I would kind of like to understand in order to, so it went to jury, yes, and it, how many jurors were there? Six. Okay, and so was the jury instructed on the the question that we we talked about in terms of what type of officer is required? Was the jury asked to make a determination whether the person was an officer within that, what was the jury instruction on that? The jury was instructed with the boilerplate, or I shouldn't say boilerplate, the Form 3294, Civil Code 3294 instruction, and so that's all that the jury was instructed. So the Court makes an excellent point, which is one of our first points, and that is all these issues are framed by the instructions given to the jury. Because my understanding back in the day when I was a trial judge, that basically in criminal matters we have a sua sponte duty, sometimes with the law. In civil matters, for the most part, the law is what the lawyers tell us what the law is, unless it's objected. So we now, we have this, later we're faced with a legal argument that Samson is required to show by clear and convincing evidence that Wells Fargo's managing agents act with that told that the person had to be a managing agent and what a managing agent was. Were they instructed on that? No, no, Your Honor. No, they were instructed, neither were they instructed on what the meaning of officer is. And that's, and from what I know, that it's very standard. That because that is all the law says, the jury has to be instructed with. So what evidence then did you introduce that at least Mr. Gwinn and or Mr. Sweeney had broad discretion over displacement policies? Well, first of all, the first issue was whether they were officers within the instruction in the law. Okay, and I can answer that first, but if you want me to answer the managing agent, I can. They are in the as we show that somebody who is involved in this displacement decision was an officer or a managing agent, then the jury was entitled to find what it did. And here's, as I answer your question, this is the important part that I was trying to start with, and I will answer your question because that is the ultimate question in the appeal. But remember, this is a case where the business decision, saving money, the jury was charged with finding which version were they going to believe based on the competing evidence. The jury decided that it was retaliation, that her medical leave of absence was a substantial motivating reason for the displacement. That's in the instruction. That's what the jury found in the special verdict. So I... Okay, and that's why she won. But then there's the punitive. Absolutely. Okay, and my understanding is that the district judge said that there was not sufficient evidence regarding that basically, that I think the district judge said only the last person in the and Adams. And the district judge said Adams is the only one that was a managing agent, and all that Adams did would go approved. Yes. So let's just assume that's correct. That's not correct. But let's assume it is for the moment. Yes. I'm looking at other things that the jury, the jury knows that your client, she says she has to go on medical leave for endometriosis on, I think it's October 28th, and she'll be back in December. Yes. The next day, then the displacement starts. Yes. My understanding, is there anything in the record that shows that your client had ever been told that her work was substandard? Never. Okay, so the next day it starts. Not the day before, not the day, just the next day. Or three weeks before. Right, and so then they start. And there's also comments by Gwen that she wasn't really that good, so maybe we need to sort of think about that. But as far as in the record, there's no evidence they ever talked about to her about not being that good. Correct. So then we know that Gwen and Sweeney, they talked to HR saying, can we displace someone when they're on medical leave? Yes. And so it triggered in their mind, hmm, she's just taking medical leave and the next day we're now trying to get rid of her. Yeah. And what did HR say? What does the record show on that? HR said fine, you know. Fine. So then, and ultimately this gets approval from, the displacement gets approved by Adams. Well, but there's a lot that happens before that. Well, I'm wondering, okay. It's important. What proper inferences can be made from all of that, that Gwen, Sweeney, and Adams are communicating about this? Absolutely, Your Honor. That's a perfect question and the answer is first of all, when are you going to ever have direct evidence that these three high-ranking corporate officers got together and there's a tape recording of them saying, we don't care she's on leave, we don't want her in there because we want to hire a new person. No, I mean, as far as I'm concerned, I will concede, you don't have to convince me that people have to admit to everything. Right, so the question. But how does the circumstantial evidence... Well, the first thing that's important, right, is we've got to look at authority, just like Your Honor first started talking about. And in the record is Gwen, he's the first person, the regional vice president who was her immediate boss. He ran the Long Beach branch. He had authority, he admitted on his own to displace Ms. Sampson. He says that in the record, under oath, the jury heard that. Now, why did he go to Sweeney? Because he wanted his support. He went up the chain of authority to go higher. Because he had to? No, because he said, I wanted his support. And that's what I was trying to get at the beginning. Wells Fargo and the district court, respectfully, turned everything around. This was a case where the first person had the authority to displace her. He wanted... He, though, figured out, and the jury could infer this, that he figured out that, you know, for this kind of thing, it's kind of touchy. Let me go higher. Not because I need to, but because, and he said, I didn't need to, but I thought I should. Why does he think he should? That's the testimony he gave. He thought he should. So he admitted somewhere in the trial that he had the authority to go ahead and displace her. He could have done that on his own. Absolutely. That's in the record? It sure is. And we've cited it, and I can dig it out for you, the court, for sure. All right. That is a key fact, because that's what I'm saying. This starts at the... It's not the bottom. He's pretty high up already. He's a regional vice president. We've got that record covered about how much authority he has. And he does have authority. It says in the record, he admits to hire and fire staff to select the incoming new portfolio manager, too, who's going to take her place. He has that authority. Of course he does. He admitted... Well, of course he does, and he admitted it. So then, that's what I'm saying. He goes up higher. Why? Because he has to? No. Because it actually is the other way around from what the D.C. District Court ruled. He said, or the judge said, the court said, the fact that Mr. Gwynne went higher shows, oh, he didn't have any authority. He had to get the okay of Sweeney. And then Sweeney didn't have the authority because he had to get the approval of Adams. No, that's not what was testified to at all. And it certainly was a matter of dispute, which the jury resolved in our favor. You climb up that chain, not because you need to, but because you actually are involving even higher levels of authority in committing this wrongful retaliation, which the jury found. So when did they ultimately let her go? They made the decision... Well, they let her go the day she returned to work on December 9th. She went into the office. He immediately... Gwynne... That's right when she came back. Right when she came back. Took her to Starbucks. Was there any evidence in the record that this reorganization... Not whether you agree with it or not, but was there any evidence in the record that this reorganization was in play before she went on medical leave? I think there is stuff in the record. And what there is is this report that they placed in the file months later. Oh, here it is. What they did is they provided this kind of cover-up paperwork to show this is a legitimate business decision. We had this in mind weeks ago. That's why a summary judgment was granted earlier in this case. And this court reversed. Because they said, well, you can say what you want. But we have other evidence here, people. We have a memo, which we introduced at trial, and that was just a piece of this. We have a memo written the day after that says, I want to run something by you, Stender Sweeney, who's Jason Gwynne's boss. Again, right away, he knows he can do it, but he wants to move higher. Not to get approval, but to get this support from even higher corporate officers and managing agents. Okay, but we're trying to get our arms around the evidence, because there's a sufficiency of the evidence claims that's made here. So, and I do realize that it was remanded 2-1 on a summary judgment saying the summary judgment was wrongly granted. So, this memo that you're talking about, what was the evidence at trial? Wells Fargo said it was in the file that this reorganization was in progress before she went. Well, no, I don't want to know what you agreed with. I want to know what the jury heard. I can see your lips are moving before I'm done. Okay. But you said memo, and that wasn't a memo. It was, I think, a 16-page report or something like that. The memo was, sorry, Jason Gwynne's email memo. I'm sorry, the email. Okay, was there disputed evidence before the jury about that memo? The Jason Gwynne memo or the big report? Well, about the reorganization starting before she went on medical leave. Yes, but we said that was a cover-up. That was done after the fact. In other words, that after the fact report comes in and tries to explain that, oh, this happened, this started in the works weeks ago. The jury rejected that just as this court rejected it as being the only evidence. So we have to, no, you view the evidence in the light most favorable. And, by the way, the first thing. What did your client testify to? Did she say she didn't know anything about the reorganization? She had no idea. No, she had no idea that this was set in motion, and it wasn't set in motion. This started the day after she said, I want to go on a medical leave. That's the damning part of that email that her boss, who himself had the authority to cut her loose, went to above, who is another high-ranking, even higher senior, sorry, executive vice president, just like Adams. He went up the chain and said, aha, I want to run an idea by you. Let's get rid of Patricia, and we'll do it as a cost-savings thing. Because what we'll do is, and it's in the facts, so I don't have to go through the details because we don't have all day. But the fact is that that's exactly what the jury found, and that's why the standard of review, as the court knows, is so crucial here. And, again, I know we're looking at clear and convincing evidence, but remember that on a judgment as a matter of law, in order for the district court or this court, because this court is on de novo review now, the court's sitting just like Judge Wu did or the district court did, but you put away what the district court found. And, by the way, the district court's order, if you read it, it is a masterpiece in ignoring the standard of review on a judgment as a matter of law. Well, I think some of these things are like summary judgment perhaps might be that no reasonable juror would. And so two judges said, no, you don't get summary judgment. Then it comes back. And then what we know is after trial, we have a little more information than the first panel had because six jurors heard evidence and said, we think there was retaliation and we think that punitive damages were satisfied. So when we evaluate the evidence, we have to give all. Circumstantial evidence can be considered. We give inferences in favor of the jury verdict. Yes. But the Judge Wu seemed to feel that just the approved was not sufficient. That is certainly what he felt. But that's what I'm saying. He's not supposed to look at this verdict and this result through his own eyes. He's not supposed to put aside the jury verdict and say, well, this is how I would have decided it. That's not how it works, as this court knows. And that's the standard here. He's supposed to indulge all inferences in favor of the jury verdict and plaintiff's evidence. He did none of that. He indulged none of them. In fact, I think his language was that at least with respect to the e-mails or the phone conversations with Mr. Adams regarding the retaliatory information, he deemed that purely speculative. Yes. So let me ask you, what evidence then did you introduce that showed that Mr. Adams knew that his one-word approval was a conscious disregard of your client's rights? That's a great question, and the answer is this in several pieces. One is, remember, as I said, this all became a team of high corporate executives. A team. They had discussions. We know that. The jury found that. They had discussions prior to the actual rubber stamp, if you want to call it approval. Sweeney said, oh, well, the fact that he just said approved on the e-mail for sure indicates from our experience and our custom that we would have had discussions about this. He wouldn't have just done it like that had we not talked about this. So we know there were discussions. And the second thing is, on that e-mail that he received from Jason Gwynne through Stender Sweeney, it said, now, this is a cost savings measure. He didn't say it has nothing to do with a medical illness, of course, but he said it's a cost savings because we have this one open PM1 position at $100,000 out there to fill. But if we get rid of Patricia, that's $100,000 too. So we've got $200,000. And what I'm going to do is I'm going to hire a PM2 to take over both these positions. So that saves $75,000 by my math. So that's what he says. And there's other things too. But Mr. Adams was the executive who actually implemented the hiring freeze. So he knew personally that there was no open PM1 position. It was bogus. Well, let me ask you, did the jury hear their rationale? What you've just said. Yes. Did the jury hear that? Yes, the jury heard that. That what Wells Fargo's rationale was in terms of business-wise and saving money. Yes, absolutely. It's right in those emails. It's clear as day. You know, and the bank says over and over, well, there's not enough written documentation, written evidence. Well, one of the reasons is just the emails. They don't keep any notes. So there's these emails, which are damning, and we've got them in the record. The jury heard them all. This was the crux of the case for retaliation. But also, once you find retaliation, as you know, the next question is, did an officer managing agent commit this retaliation? There's a lot here, but you're down to a minute and a half. Do you want to save that per rebuttal? My total or my $15,000? Oh, no. Oh, I never told you what it was going to be. Well, you've got a minute and a half out of the 20. Yeah, that's all you got. So unless judges have questions, you might want to reserve. I will, then. Thank you. No, I don't have any questions, but when you get back up, I would like to hear where in the record Gwen admitted that he had the authority to take these actions. Gwen? Okay, I can do that. If you can get a record site for that before you come back. I'll do that. Thank you. Okay. Thank you. Good morning, Your Honors. Good morning. I would like to reserve five minutes, if I could, for rebuttal. As a starting point in response to the question I just heard, I think as a first point, there was the Casey instruction on punitive damages. I believe it's 3945, which comes straight out of White v. Ultramar, has a definition of managing agent, says everything we've said in the papers. It tracks the law. So this notion that the jury never knew about managing agent or anything, that's just not. Well, so they looked at all the evidence, and they decided that someone was a managing agent. Absolutely. So the question then becomes. Sufficiency of the evidence. Convincing evidence in the record to support that conclusion. I assume the jury concluded that. Okay. So let me ask, let me just start with the elephant in the room. Yeah. Okay. That the timing, temporarily, which is something we always look at in employment law. It's like if you go file an HR complaint, and then the next day you get fired, and you've had a million superior things. There's a temporal. It kind of stinks like a week-old mackerel here, that the day she goes, she gives him a letter, says, I've got to take off from, what, October 28th to December something for her endometriosis. Right. The next day, it starts buzzing. How do we get rid of her? And talking to HR about, can we get rid of someone when they're on medical leave? And what appellant is saying on the main part of it is that she's not on any notice that she's got deficient, and she's not on any notice of this plan to reorganize. So that's a stinky fish for you. Yes. Let's assume that's all true. Okay. I think you do have to take into account, though, the jury answered, the first question they answered was, at the time they made the displacement decision, were they aware that Patricia Sampson had a condition that limited her ability to work? And they said no. They said no. Which is hard to reconcile. I looked at that. Yes. But then they also said that she was retaliated against for taking medical leave. Said her taking medical leave was a contributing factor. Okay, let me answer as a woman. Yeah. All right. Endometriosis is something that's not unheard of. She's taking a leave for a period of time. We don't know. She could have been having surgery to relieve her endometriosis. She could have been having a hysterectomy. I don't know, you know, any of that. That doesn't necessarily make you a disabled person in the future. So the jury could have thought, okay, she needed medical leave, she had a medical condition, she gets it, but she's not a disabled person from working when she comes back. Okay, well, let's assume that's all true. Although the question was, at the time they made the decision, were they aware she had a condition that limited her ability to work? The note says, I need to be on leave from work. But let's assume, for the sake of argument, because I don't think it ultimately matters to the punitive damages question, let's assume that the decision to terminate her was motivated by retaliation. Let's assume that. There's some facts that are not avoidable that are admitted. That there was initially a decision to hire somebody to accompany her. And just before, and Ms. Sampson doesn't deny this, just before that person was hired, John Adams came into power and issued what they called the hiring freeze. And Patricia Sampson testified she was aware of the hiring freeze. So that decision to hire was stopped by John Adams. And Jason Gwynn did not have the power to hire a second person. Now, there is some evidence, vague as it may be, that Jason Gwynn, as a general matter, had powers to hire and fire employees. That doesn't make you a managing agent. A lot of people have the power to hire and fire. That's in Kelly-Zurian that was cited by White v. Ultramar. The question, though, is to displace and hire somebody, this plan that they had, that had to be approved because there was a hiring freeze. And Jason Gwynn didn't have the power to do it. Stender Sweeney didn't have the power to do it. That required the approval of John Adams. That's all of his people. Sotomayor, what did the jury hear? That's what the jury heard. The jury heard exactly that. But you do concede that Mr. Adams does have the qualifications of an officer, director, and managing agent. I would say managing agent. We didn't dispute it. Now, he was never called to testify in this case. What it's really about is the plaintiff never called witnesses or asked questions that they should have asked foundational questions. So with regard to Mr. Adams, at least, he has that degree of discretion. I assume so, yes. Let's assume that. Now, let me ask you about Mr. Sweeney then. He is a regional vice president. And I'll get to that as well. So he has only six direct reports. Correct. And it seems to me that a person like Mr. Sweeney, who has really undocumented conversations going back and forth with Mr. Adams, and Mr. Adams responding to his request with a one-word answer, shows that Mr. Sweeney does have a level of discretion and authority to make some decisions if Mr. Adams is pretty confident that he's going to follow suit on whatever those decisions are with regard to displacements or hiring or reconfiguring the structure of the PM1 versus the PM2. So I'm struggling to find why Mr. Sweeney doesn't meet that degree of discretion that the law requires. That's a fair question. So first of all, the standard is he has to have authority to make corporate policy. It's not exactly make corporate policy, but to have substantial influence in making corporate policy. He has to have certain powers. The power to basically ask someone else to approve something, and you're trusted because you're good at your job and the person approves it, that's not evidence that you have the power. That's evidence that you might be trusted by someone above you. Questions that would be relevant would be, what are your general powers in your job? What do you do in your job? What is your job? None of that was asked. The only question that was ever asked of Mr. Sweeney regarding his job was how many people report to you. And that is certainly not clear and convincing evidence. That's not evidence at all of the kind of powers you need to qualify. As well, he was the corporate representative at trial. So he sat through the entirety of the trial, didn't he, Mr. Sweeney? Well, you can name anybody to be the corporate representative at trial. I could have an HR person be the corporate representative at trial. You need to have a person, and since he was going to testify, they selected him. But I don't think that makes you a manager. There's no case I've seen that designating someone as your representative at trial makes them a managing agent. Now, there is this issue about what discussions were had between standards. Well, let me ask you, though. Okay, because of the way the instructions were, did you argue these factual issues to the jury that none of these people? Yes. And the jury found against you on the factual issues? That's true in every case where there's a lack of evidence. You could say the jury found. Well, you can, but I'm just saying. The way it was presented to these six people was you're the ones that decide, and Mr. Chang argues one way, you argue another way, and I have to assume they resolved it against you. I assume so as well. By virtue of the verdict. Correct, again, which is true in every case that punitive damages are awarded. You assume the jury, and there's no argument here that the instructions were wrong. We all agree with that. And closing argument for what it's worth, I said these people are not, nobody here is high enough, and plaintiffs said in somewhat summary fashion, everybody here is high enough. These are high-level people. They have vice president titles. That's not the standard. Having a vice president, there's the Holtzclaw case. None of the cases they cite hold this notion that having a vice president title makes you a managing agent. It's based on powers and duties. Well, I think Ultramar, White v. Ultramar sets the standard. Yes. It's basically whether the employee exercises substantial discretionary authority over significant aspects of a corporation, and I'm struggling to determine why hiring and replacing PM1s and PM2s, and combining those positions is not a discretionary activity. There's no evidence that Mr. Gwynne or Mr. Sweeney had the power to combine positions. Well, I think the problem, though, here as well is I think Mr. Sweeney repeatedly testified. I saw in the record that he had a policy, a personal policy of not documenting anything, any conversations that he had with Mr. Gwynne, with Mr. Adams. He had a vague recollection of some communications that he had with Mr. Adams. He possibly had a couple of e-mails that came in, but isn't it reasonable for a jury to infer that there was some sort of nefarious, you know, sort of conduct in that regard, that they were sort of avoiding documentation of this whole replacement? This is a clear and convincing evidence standard. The evidence is there may or may not have been some discussion that preceded the approving of the plan, but on its face is a lawful plan. On its face it talks about saving money by having the original plan of having $200,000 people, having a new plan with one person that's $125,000, and it explains we went to HR, she's on leave, they said that that's still lawful, and it's approved. It can be lawful, but it doesn't, but I don't know. I'm a co-author of the pink book, Rudder Employment Guide, and I'm just wondering what you're saying that you don't, that employers don't need to be concerned about when they've never talked to someone about their, you know, what's going to happen, when they've never said that they're deficient, and then the day after they go on leave, then they start saying, well, she's not really very good anyway, and let's get it done, and let's talk to, I hope that you're not saying that's a great employment practice. What I'm saying is that the evidence is that Mr. Adams, the only managing agent by my stretch, I don't think, I think the only evidence of Sweeney's powers and duties is that, I guess he didn't document things, I don't think that counts as him creating a corporate policy, that he needed to get approval. But what Judge Humito was saying, that can be like you're sneaking around behind someone's back. That's what, I mean, they can make all those inferences. I understand, there's two different notions here. One is, did he have bad intent, was he a bad person, whatever the long lines. The second is, was he a managing agent? And we keep getting away from the clear and convincing evidence of powers and duties, and let's say Adams had them. But let's say the jury thought, what kind of employer plots against people the day after they go on a medical leave? That's a question of malicious, that's a question of despicable conduct. Well, I mean, someone could think, like, that's malicious. They could, but that's not the question, that was the appellate question. Nobody, Judge Wu did not throw out the punitive damages on the basis that there was a lack of evidence of malicious, oppressive, or fraudulent conduct. I think that's debatable. And because it's debatable, we'll just go with that. But he threw it out because there was no evidence that Gwynne, Sweeney, or the HR people qualified as managing agents. And on that question, the only evidence that has been presented by this panel so far is that Sweeney said he may have had a conversation, but he doesn't remember. Okay, but you concede that Adams was. I do, but Adams never testified. All right, but listen, listen, listen. You concede that Adams was. And so let's just take that and say if we just look at Adams and we look at what Judge Wu did, Judge Wu said there was not sufficient evidence in the record that Adams met, that there wasn't sufficient evidence to show that it met the standard against him. So we independently look at that, and if we don't agree with that, then you lose, right? Do you find clear and convincing evidence that Adams had engaged himself or knowingly ratified, maliciously oppressed for fraudulent conduct? Yes. But the only evidence in the record, Adams never called to testify. The only evidence in the record is this memo that he approved that on its face says, I checked with HR, they say this is lawful. It doesn't say we had a secret plot, we just came up with this. I'm going to have to call you out on it. It's not the only evidence in the record that was before the jury. Now, you may disagree with some of it, but the evidence in the record also shows the pattern of when all of this began, when she was on medical leave, all of that, and that they don't have notes of anything, that it goes somewhat up the chain and then goes approved. So we have to look at all of that evidence, and if we see it differently than Judge Wu, then. . .  But what is the evidence of Adams? Adams, there's no dispute, nobody has claimed that Adams was consulted earlier. The only evidence, if there's any evidence, because Adams was never called to testify, none of these questions were asked at trial. There is evidence against Adams, whether it's sufficient that they're all in a chain of command. There's a bureaucracy that's going on. It's clear that there were conversations between them. We don't know what they are. But what the appellant is arguing is, you know, people don't always directly put down, hey, we're doing this for this, that, and the other reason. Circumstantial evidence can be sufficient if one looked at all, everything that the jury heard. That's what we have to look at. I understand that, but it's still, again, it's clear and convincing evidence. And focusing just on Adams, the only testimony about Adams, because remember, he didn't testify, was Sweeney saying that he believes, because it was a one-word response, he may have had additional conversations, but he doesn't remember if he did or didn't. That's the evidence. There's no other evidence that, whatever you want to say inferentially about the people below supposedly conspiring and having the secret plot, there's no involvement of Adams' involvement. What if the jury didn't believe Gwynne and Sweeney? What if they thought they were liars and that they thought they had this conspiratorial plot against Sampson from day one? I think it would behoove the plaintiffs then to call Adams and ask him this question, and then the jury could evaluate whether Adams. But I can't worry about what Adams would say. We're stuck with what the jury heard. Exactly. We're stuck with what the jury heard and what they heard. And can a reasonable jury, with everything that they heard and inferences that are entitled with the verdict, is that sufficient? And the answer, I think, is no. I know what you think. I know what your answer is. But I'm telling you the job that I have to do as a judge. I understand what you're saying. Okay. Should I address the attorney's fees? You should address whatever you want to address. Because the punitive damages kind of under-undervise everything else. I do think it's important that when you go back to look at the standard for what qualifies as a managing agent, unless you're just going to base it on Adams, if it's based on Sweeney, the cases that are cited, it's not just White v. Ultramar, but also Colucci v. T-Mobile and Davis v. Kiewit. They all say that it requires having powers to create your own significant corporate policies or to have substantial role. It's not just the ability to ask someone else for approval. So is Adams the only one that can hire and fire people? No. I mean, again, it's not hiring and firing. There was a hiring freeze that he put in place. That's a very high-level thing. So is he the only person that can redesignate a PM1 to a PM2? He was the only person. The situation they faced was there was a freeze put on additional headcount at the high levels of the company. They wanted to fill this spot. They didn't need to fill. They just were going to hire a second person. That got stopped by the hiring freeze. Can you answer the question? Was he the only person that could do that? He was the only person that could approve the plan that involved increasing headcount because he put a policy that said no headcount increase. So Mr. Sweeney had no authority? We don't know because nobody asked him that question. He might have had that power. He might have had all kinds of powers, but the jury has to be asked questions about what your job duties to know what your job duties are. All we know is that his job duties were something that involved him having to get approval from Mr. Adams on this particular matter. We don't know anything else about what his job involved. Nobody asked him that question. Well, we know that he has six direct reports. Correct. And that he covers the greater Los Angeles area. Well, that's true. I mean, the Kelly-Zurian versus Bull. But he doesn't have any discretion in that job. We don't know what his discretion is because, again, there's 300 in the list exact number. There's 259,800 employees in Wells Fargo. According to the trial testimony, it's referenced in the judge's order. He may have had all kinds of powers. I mean, in Kelly-Zurian versus Wall, which is the case that predated White versus Ultramar, the person was a second-line manager, just like Mr. Sweeney, and they found he was not a managing agent because it's not a question of where you are in the hierarchy or what your title is. It's a question of your powers and duties. I guess let me just – I feel like we're talking past each other. So do you think then, I guess, that there is nothing in the entire trial record from which the jury can draw that Mr. Sweeney has any discretionary authority to manage people? It's not just to manage people. That's the definition of a manager or supervisor. It's to make decisions on the level of formulating corporate policies. It's right in the jury instruction. And, yes, I agree, there's no evidence of that because the questions weren't asked. And that's what Judge Wu says. He says maybe he could have been if he'd asked the right questions, but, Your Honor, this notion of I feel like we're talking past each other on some level because you're talking about is a person a manager? Do they have powers to hire and fire? Do they have some kind of ability? No, I'm talking about discretion, to make discretionary policies or decisions for the company. But to simply hire an employee. Let's say the company has a policy. But this is kind of cute by half. You could have asked and said, Mr. Sweeney, could you have accomplished this without approval? But you didn't. It's not my burden to prove. Why do I have to ask questions that aren't my burden to prove? No, but in the absence of that, we have to look at what the jury saw and how it relates to the instruction. And you're saying from what the instruction said and what the jury heard, there's no way that a reasonable jury could conclude. Saying there was a lack of clear and convincing evidence in the record. We keep kind of alighting the whole higher standard here. And Your Honor is taking this to view of could any inference be drawn, even in the lack of proper questions being asked, could any inference be drawn possibly that Mr. Adams knew that something fishy was going on here or that Sweeney had certain powers that no one ever testified about. That is not clear and convincing evidence. I don't know what that is, but that's certainly not that. Okay. So you're over time. So you don't even have five minutes left. That's okay. But let me find out if any of that. I'll give you two minutes. I appreciate it. Okay. Thank you. I don't know that that's that benevolent, but it's more benevolent. The whole cross appeal about attorney's fees, which neither side discussed. Yeah. Okay. Well, you both briefed it. So that's. Would his two minutes be just limited to the fees issue? Right. Because this is a little bit. Okay. All right. You both briefed everything. So it's a bit of a free for all. We're trying to get to our questions. All right. Well, that's fine. And okay. So let me just first. I give Judge Thomas one of those sites. I've got them right here. Thank you. And I'll quickly read them. Gwen had hiring and firing authority. He admitted he had authority to displace Samson, but he sought Sweeney approval because he felt he should for support, similar to Sweeney who had authority to displace Perquin and others. Here are the sites. 4060, this is to the ER. 4146, 4158, 4159. Gwen could hire. This is from Jason Gwen. He could hire and fire staff. 15ER, 3998-3999. When it came to who to hire for the PM2 position, the one that replaced Patricia, it was ultimately Gwen's choice to hire Kim, the new one, 40858-4059. He also could alter policy as proven by, this is Gwen, when Gwen displaced Blaine, if this was the first time he had ever displaced someone while on medical leave, 3953. And that was echoed by Sweeney and Pham, a lower level person. But this was the first time it had ever happened, and it hasn't happened since. And then, finally, for Gwen, even though the PM2 position was not even a position in the Long Beach office, that was Gwen's office. He was able to use his authority and influence to deviate from the hiring freeze, he, Gwen, and hire a more expensive Eddie Kim as a PM2. The sites, 3977-78, 3981-3982, 4099, 4301, 4425-426, and 4432. Now, I also want to talk about Sweeney because, first of all, counsel admitted to the, after evidence was in, that, yeah, I guess you could say Sweeney was a managing agent. Of course he did because, as your honors know, he was a managing agent. He had such discretionary authority, and we didn't make that up. That's in the record. Take a look at 3998-3999. Gwen testifies, and, again, we asked questions, and we also got answers. We got answers from Wells Fargo people themselves. They provided the evidence that we needed to show to the jury. We didn't have to ask anybody else. Gwen testified. I had to make a presentation to Sweeney to obtain permission to hire another PM1 in July 2014, 3998-3999. Again, he goes to Sweeney to obtain permission to hire another PM1. Sweeney has tons of discretionary authority. Sweeney's approval, according to Gwen, was also required before a plaintiff could be displaced. They did make that argument, but he was admitting that Sweeney was part of this team. 4003, 4060, 4146, and 4158 to 4159. Sweeney had authority to hire, fire, and deviate from corporate policy, such as a freeze, if necessary. 3978, 4301, 4426, 4432. This does the timing stinks, just like the runner said. This court said so three years ago in reversing summary judgment. The jury said so. This court just knows that it still stinks. It stunk for the jury. Adams, by the way, wasn't just an EVP. He was second only to the CEO of the entire bank, and that's at 4640, I believe. Okay. Okay, thank you. Thank you. All right, so I'm going to give you three minutes. I appreciate it. Okay, so. Okay. First of all, there was never any admission that he was a managing agent. There was a statement in the post-trial motion that the only person who even comes close to qualifying is Mr. Sweeney. Just to take that off the table, there's no admission in this case that anybody's a managing agent except for perhaps Mr. Adams. Second, I do think I want to make sure the factual record is clear of what was in the record in terms of what happened prior to Ms. Sampson going on leave. It is undisputed that there was a plan to hire another PM1. It is undisputed that that got stopped after the person was offered the position by Mr. Adams instituting a hiring freeze. It is undisputed that the jury found that at the time they made a decision to displace, nobody had any idea that Ms. Sampson had a medical condition that limited her ability to work, but she testified that they did. She said, oh, yeah, I told them that I had this horrible endometriosis that impaired my ability to work. The jury rejected that, and that has to be given deference just as well. That's part of the verdict that they found. They did not know she had a condition that limited her ability to work when they made the displacement decision. We know she goes out on leave, and then immediately after that, there was movement to go to find out whether or not they could, instead of if they could replace her and fill, because she was going to be gone for a while, if they could fill this need that they already had, they had this need for another PM1 that was on hold. It's only a six-week leave, right? It turned out to be about a nine-week leave, but they were looking for a way to address the issue of not being able to hire two people. They could only hire one person. If they could get, in the face of this hiring freeze, they could get one person that would do the job of more than one person, and that's where they went to HR to say, can we do this while she's on leave, and there's a record of HR approving that, and then ultimately the question is submitted up to John Adams, who approves, approved. There is no testimony of any sort from any person, including Sweeney, that prior to the time of Ms. Adams, or Ms. Sampson going on leave and the time of Ms. Sampson proposing this notion of hiring a second person to replace, hiring a PM2 to replace the two PM1s, if there was some discussion between Sweeney and Adams, Gwyn and Adams, there was no evidence of that whatsoever. The only evidence that's actual evidence. Because they didn't document any of those conversations. Yes, but you can question people. You can ask people, did you discuss this issue with John Adams? And you could bring in John Adams, John Adams, and let the jury evaluate them. That's normally, when you have a clear and convincing evidence standard, you can't just eliminate all the evidence and say, I think the record showed that Mr. Sweeney did say he had conversations with Mr. Adams because otherwise Mr. Adams would not have issued the single approval statement. That's not exactly right. What he said is, when I see that there's only a one word approved here, I assume there were probably conversations, but I don't remember what they were. That's what he said. Now, you want to go a leap from that and say that's clear and convincing evidence, that not only do you have conversations, the conversations went beyond what was in the memo he wrote him, which specifically said, she's on medical leave and I've gotten approval from HR, which is all true and undisputed, but that he said, I have a real reason to do this, which is not the business case. So wrap it up. You've gone over your overtime. Okay. Okay. Wrapping it up, this all comes down to clear and convincing evidence. That's what Judge Wu found. And I hear your panel very clearly, that you think that there's some evidence there, there's inferences, but I really don't think it meets that standard, and I think if you look back at the cases and the standard. Well, we're asking questions. You can't guess. We haven't conferenced on this, but we have to ask the questions. And I appreciate it. I'm sorry if I became animated, but I appreciate it. Thank you very much. No, I have that tendency myself, so I would never hold it against someone. All right. Thank you both for your argument. This matter will stand submitted.
judges: CALLAHAN, THOMAS, Humetewa